# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>   v.<br><br>CITY OF MILWAUKEE; CAVALIER JOHNSON, Mayor of Milwaukee, in his official capacity; EVAN GOYKE, City Attorney of Milwaukee, in his official capacity; JEFFREY NORMAN, Chief of Police, Milwaukee Police Department, in his official capacity,<br><br>        Defendants. | No. 26-cv-1293<br><br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

    I.    Governing Principles of Federal Law Enforcement ............................................. 2

    II.    The Challenged Milwaukee Ordinance ................................................................. 5

LEGAL STANDARDS ........................................................................................................ 8

ARGUMENT ....................................................................................................................... 8

    III.    The United States Has Pre-Enforcement Standing ............................................... 8

    IV.    The United States is Likely to Succeed on the Merits of its Claims............................... 11

        A.    Applicable Law ....................................................................................... 12

        B.    The Challenged Ordinance Impermissibly Regulates the Federal Government........... 13

    V.    The United States Faces Irreparable Harm Absent Preliminary Relief ............................ 18

    VI.    The Balance of Hardships and the Public Interest Weigh in the United States' Favor. 23

**TABLE OF AUTHORITIES**

**Cases**

*ACLU of Illinois v. Alvarez*,
679 F.3d 583 (7th Cir. 2012) ................................................................................ 23

*Am. Fin. Servs. Assn. v. Burke*,
169 F. Supp. 2d 62 (D. Conn. 2001) ..................................................................... 23

*Arizona v. California*,
283 U.S. 423 (1931) .............................................................................................. 15

*Arizona v. United States*,
567 U.S. 387 (2012) ........................................................................................... 4, 18

*Babbitt v. United Farm Workers Nat'l Union*,
442 U.S. 289 (1979) ................................................................................................ 9

*CoreCivic, Inc. v. Governor of N.J.*,
145 F.4th 315 (3d Cir. 2025) ................................................................................ 12

*Entertainment Concepts, Inc., III v. Maciejewski*,
631 F.2d 497 (7th Cir. 1980) .................................................................................. 9

*Goodyear Atomic Corp. v. Miller*,
486 U.S. 174 (1988) .............................................................................................. 12

*Hancock v. Train*,
426 U.S. 167 (1976) ......................................................................................... 12, 13

*Illinois Republican Party v. Pritzker*,
973 F.3d 760 (7th Cir. 2020) .................................................................................. 8

*In re Neagle*,
135 U.S. 1 (1890) ....................................................................................... 15, 17, 24

*Indiana Right to Life Victory Fund v. Morales*,
66 F.4th 625 (7th Cir. 2023) ................................................................................... 9

*Jensen v. Lane Cnty.*,
222 F.3d 570 (9th Cir. 2000) ................................................................................ 11

*Joelner v. Vill. of Wash. Park*,
378 F.3d 613 (7th Cir. 2004) ................................................................................ 18

Case 2:26-cv-01293-LA    Filed 07/24/26    Page 3 of 33    Document 4

*Johnson v. Maryland,*

254 U.S. 51 (1920)......................................................................................... 13, 15

*K.C. v. Individual Members of Med. Licensing Bd. of Indiana,*

121 F.4th 604 (7th Cir. 2024)................................................................................. 8

*Lujan v. Defenders of Wildlife,*

504 U.S. 555 (1992)............................................................................................... 9

*Mayo v. United States,*

319 U.S. 441 (1943)................................................................................... 12, 17, 25

*McCulloch v. Maryland,*

17 U.S. (4 Wheat.) 316 (1819)................................................................. 12, 17, 21

*New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans,*

491 U.S. 350 (1989)............................................................................................. 18

*Nken v. Holder,*

556 U.S. 418 (2009)......................................................................................... 8, 23

*North Dakota v. United States,*

495 U.S. 423 (1990)............................................................................................. 12

*Pub. Utils. Comm'n of State of Cal. v. United States,*

355 U.S. 534 (1958)............................................................................................. 16

*Rowe v. N.H. Motor Transp. Ass'n,*

552 U.S. 364 (2008)............................................................................................. 22

*Seila L. LLC v. Consumer Fin. Prot. Bureau,*

591 U.S. 197 (2020)............................................................................................... 3

*Sol Inc. v. Whiting,*

732 F.3d 1006 (9th Cir. 2013)................................................................................ 8

*Spokeo, Inc. v. Robins,*

578 U.S. 330 (2016)............................................................................................... 8

*Steffel v. Thompson,*

415 U.S. 452 (1974)............................................................................................... 9

*Susan B. Anthony List v. Driehaus,*

573 U.S. 149 (2014)............................................................................................... 9

*Tennessee v. Davis,*

100 U.S. 257 (1879) ................................................................................................ 3, 15

*Tweed-New Haven Airport Auth. v. Tong,*

930 F.3d 65 (2d Cir. 2019) ............................................................................................ 9

*United States v. Alabama,*

691 F.3d 1269 (11th Cir. 2012) ................................................................................... 23

*United States v. Arizona,*

641 F.3d 339 (9th Cir. 2011) ...................................................................................... 18

*United States v. California,*

173 F.4th 1060 (9th Cir. 2026) ............................................................................. passim

*United States v. California,*

921 F.3d 865 (9th Cir. 2019) ................................................................................. 15, 16

*United States v. City of Philadelphia,*

No. 2:26-cv-4208, 2026 WL 1906075 (E.D. Pa. July 2, 2026) ................................... 14, 23, 25

*United States v. Commonwealth of Virginia,*

No. 3:26-cv-545, 2026 WL 1909995 (E.D. Va. July 2, 2026) ................................... 14, 23, 25

*United States v. Connecticut,*

566 F. Supp. 571 (D. Conn. 1983) *aff'd without opinion*, 742 F.2d 1443 (2d Cir. 1983), *aff'd without opinion*, 465 U.S. 1014 (1984) ................................................................................. 18

*United States v. Ekblad,*

732 F.2d 562 (7th Cir. 1984) ......................................................................................... 9

*United States v. Fresno Cnty.,*

429 U.S. 452 (1977) ..................................................................................................... 21

*United States v. Washington,*

596 U.S. 832 (2022) ......................................................................................... 12, 15, 17

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens,*

529 U.S. 765 (2000) ....................................................................................................... 9

*Washington v. Indiana High Sch. Athletic Ass'n, Inc.,*

181 F.3d 840 (7th Cir. 1999) ...................................................................................... 18

*Westinghouse Elec. Corp. v. Free Sewing Mach. Co.,*

256 F.2d 806 (7th Cir. 1958) .................................................................................... 8, 24

iv

*Winter v. Nat. Res. Def. Council, Inc.*,

    555 U.S. 7, 129 S. Ct. 365 (2008) ................................................................................ 8

**Statutes**

5 U.S.C. § 301 ................................................................................................................... 4

5 U.S.C. § 5901 ................................................................................................................. 4

6 U.S.C. § 211 ................................................................................................................... 3

6 U.S.C. § 252 ................................................................................................................... 3

8 U.S.C. § 1103(a)(2) ....................................................................................................... 4

8 U.S.C. § 1182 ................................................................................................................. 4

10 U.S.C. § 723(b)(1) ....................................................................................................... 5

21 U.S.C. § 801 ................................................................................................................. 3

28 U.S.C. § 509 ................................................................................................................. 4

28 U.S.C. § 531 ................................................................................................................. 3

29 U.S.C. § 668 ................................................................................................................. 5

Pub. L. 93–253 .................................................................................................................. 3

Wis. Stat. § 165.85(2)(c) ............................................................................................... 6, 7

**Rules**

Fed. R. Civ. P. 41 .............................................................................................................. 3

**Regulations**

28 C.F.R. § 0.100-0.101 .................................................................................................... 4

**Other Authorities**

38 F.R. 15932 .................................................................................................................... 3

Case 2:26-cv-01293-LA    Filed 07/24/26    Page 6 of 33    Document 4

## INTRODUCTION

The United States possesses sovereign authority to manage federal law enforcement activities, and under the Supremacy Clause, it need not cede that authority to any state or municipality. Yet the City of Milwaukee, through its newly enacted ordinance (the "Ordinance" or "Section 105-140"),[1] seeks to intrude on core federal prerogatives. Specifically, the Ordinance prohibits law enforcement officers—including federal officers—from wearing facial coverings in the performance of their official duties and requires those officers to display identifying information on their uniforms or provide it upon request. In practice, the Ordinance effectively bars federal officers from conducting critical operations within the City, such as surveillance and plainclothes operations. Violations of these provisions expose federal officers to civil penalties between $5,000 and $10,000.

Section 105-140 purports to regulate federal officers in the execution of their official duties by imposing municipal standards governing facial coverings and identification. These provisions flagrantly violate the principles of intergovernmental immunity that flow from the Supremacy Clause of the U.S. Constitution. The City of Milwaukee, like any state or municipality, has no authority to regulate federal officers in this manner—any more than it could dictate the color of their vests, forbid them from carrying firearms, or require them to recite state or local law warnings before effectuating an arrest.

The United States therefore moves this Court to preliminarily enjoin the City of Milwaukee and its officials from enforcing Section 105-140 against federal law enforcement officers. That Ordinance violates the Supremacy Clause by purporting to regulate the uniforms and identification

---

[1] A copy of the Ordinance is attached to the Complaint as Exhibit A. *See* ECF 1-1. All references to Section 105-140 herein refer to that Exhibit.

1

of federal law enforcement personnel—matters squarely within federal, not municipal, control.

The need for judicial intervention is urgent. The United States requested that the City provide assurances that it would not enforce Section 105-140 against federal law enforcement officers performing their official duties. The City refused. On July 17, 2026, City Attorney Evan Goyke informed the United States in writing that the City would not disclaim enforcement against federal officers and that his office would prosecute violations of the Ordinance. The City has thus made it clear, in its own words, that federal officers who continue to perform their duties in Milwaukee do so under the express threat of citation, prosecution, and financial penalties.

These constitutional injuries to federal sovereignty alone establish irreparable harm, but the harm here cuts deeper. If federal officers comply with the Ordinance, they face heightened risk of doxxing and harassment, and their law enforcement operations will be compromised. If they do not comply, they face citation, prosecution, and financial penalty simply for performing their federal duties. Either path inflicts injury the United States should never have to choose between.

The balance of equities and the public interest likewise favor an injunction. The sovereign injury from a local law that regulates the Federal Government is itself substantial, and the public has a strong interest in protecting federal officer safety, eliminating unlawful impediments to federal law enforcement operations, and ensuring officers can carry out their duties unobstructed. That interest is only heightened by the City's own confirmation that it intends to enforce this Ordinance against federal officers.

For these reasons, the United States is entitled to a preliminary injunction.

## BACKGROUND

### I.      Governing Principles of Federal Law Enforcement

The President has a constitutional duty to "take Care that the Laws be faithfully executed."

2

U.S. Const. art. II § 3. The authority to discharge that duty "extend[s] over the whole territory of the Union, acting upon the States and upon the people of the States." *Tennessee v. Davis*, 100 U.S. 257, 263 (1879). Because "no single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 204 (2020). In executing the laws, the Federal Government "can act only through [those] officers and agents," who must in turn "act within the States." *Davis*, 100 U.S. at 263. Accordingly, federal law enforcement activities necessarily take place within the several States and their localities, including the City of Milwaukee.

Federal law enforcement agencies, including those within the Departments of Justice ("DOJ") and Homeland Security ("DHS"), are created by federal law. *See, e.g.*, 28 U.S.C. § 531 (Federal Bureau of Investigation ("FBI")), *id.* § 561 (U.S. Marshals Service), *id.* § 599A (Bureau of Alcohol, Tobacco, Firearms and Explosives); 6 U.S.C. § 252 (U.S. Immigration and Customs Enforcement ("ICE")); 6 U.S.C. § 211 (U.S. Customs and Border Protection ("CBP")); Reorganization Plan No. 2 of 1973, 38 F.R. 15932, 87 Stat. 1091, as amended Pub. L. 93–253, § 1, Mar. 16, 1974, 88 Stat. 50 (Drug Enforcement Administration ("DEA")). All law enforcement officers within these agencies have the power to swear out and execute search warrants based upon probable cause. Fed. R. Civ. P. 41. Different law enforcement agencies within the Federal Government have different, but sometimes overlapping, authorities for the types of crimes and offenses they investigate and prosecute.

For example, the DEA enforces the Nation's controlled-substances laws. *See generally* 21 U.S.C. § 801, *et seq*. In carrying out that mission, the DEA investigates and aids in the prosecution of violators of controlled substances laws; seizes and forfeits assets derived from illicit drug trafficking; and manages a national drug intelligence program in cooperation with federal, state,

3

local, and foreign officials. *See* 28 C.F.R. § 0.100-0.101.

The FBI is charged with rooting out violent crime, defending the homeland against terrorist attacks, and investigating and combating cybercrime, among other duties. *See id*. § 0.85. It conducts extensive operations throughout the country and in partnership with federal, state, local, and foreign officials.

DHS and its component agencies ICE and CBP are primarily responsible for enforcing the nation's immigration laws. Those laws are primarily contained in the Immigration and Nationality Act ("INA"), and, pursuant to Congress's power to "establish an uniform Rule of Naturalization," U.S. Const., art. I § 8, cl. 4, make up the framework for the "governance of immigration and alien status." *See Arizona v. United States*, 567 U.S. 387, 395 (2012). The INA gives the Executive Branch broad authority to inspect, investigate, arrest, detain, and remove aliens who are unlawfully in the United States. *See, e.g.*, 8 U.S.C. §§ 1182, 1225-29a, 1231.

To achieve the goals outlined above, the head of each agency has the power to govern the agency's affairs and direct its agents' activities. *See, e.g.*, 5 U.S.C. § 301 (authorizing the head of an Executive or military department to "prescribe regulations for the government of his department [and] the conduct of its employees"); 28 U.S.C. § 509 (vesting all functions of other officers, agencies, and employees of the Department of Justice in the Attorney General); 8 U.S.C. § 1103(a)(2) (authorizing the DHS Secretary to "control, direct[], and supervis[e]" all DHS employees). Included within that power to govern the agencies is the power to determine how agents must conduct themselves when engaged in official duties in accordance with federal law. Federal law similarly empowers the Executive to provide for and dictate federal law enforcement officers' uniforms and equipment when carrying out their official duties. *See, e.g.*, 5 U.S.C. § 5901 (directing the head of each federal agency to furnish its employees a uniform or an allowance for

4

a uniform); 29 U.S.C. § 668 (requiring heads of federal agencies to, as part of their occupational safety and health programs, acquire, maintain, and require the use of safety equipment, personal protective equipment, and devices reasonably necessary to protect employees); 10 U.S.C. § 723(b)(1) (providing exception to certain identification requirements to individuals who "do not wear a uniform or other distinguishing clothing or equipment in the regular performance of their official duties").

## II.  The Challenged Milwaukee Ordinance

Section 105-140 was passed by the Common Council of the City of Milwaukee on April 21, 2026, and signed by Mayor Cavalier Johnson on April 22, 2026. The Ordinance became effective on May 9, 2026.

Members of the Milwaukee Common Council have publicly expressed that the Ordinance's purpose is to target federal officers. Alderman Alex Brower indicated that the legislation is "a means of preventing masked ICE agents in Milwaukee[.]"[2] Alderwoman JoCasta Zamarripa announced, "If they continue to work here in a secret capacity with full masks on like I've seen, then we are asking MPD and the city attorney to act as the enforcement entity and write citations to ICE."[3]

On its face, the Ordinance purports to apply to federal law enforcement officers by defining a "[l]aw enforcement officer" to include "any employee or agent of the United States government who has authority to carry firearms and make warrantless arrests and whose duties involve the

---

[2] Alex Brower, *Statement on committee approval of law enforcement ICE identification ordinance* (Mar. 12, 2026), https://city.milwaukee.gov/ImageLibrary/Groups/ccCouncil/News/2026/District-03/03-Statement-on-committee-approval-of-file-number-251797.pdf.
[3] Ben Jordan, *ICE says it will not comply with Milwaukee's federal agent mask ban ordinance, alderwoman wants accountability* (June 29, 2026), https://perma.cc/83V8-X4XB.

5

enforcement of criminal, customs, or immigration laws of the United States." Milwaukee, Wis., Code of Ordinances § 105-140(3) (2026) (incorporating Wis. Stat. § 165.85(2)(c)).[4]

The Ordinance requires that "[n]o law enforcement officer may wear a face covering while interacting with the public in the performance of the officer's duties." § 105-140(4). "Face covering" is defined as "any opaque mask, garment, or other item that conceals or obscures the facial identity of an individual, including a balaclava, tactical mask, neck gaiter, ski mask, or any similar type of facial covering or face-shielding item." § 105-140(3)(b). A face covering does not include "[a] translucent face shield or clear mask that does not conceal the wearer's facial identity[,]" "[a] medical mask to protect against transmission of disease or infection, or any other mask or device necessary to protect against exposure to any toxin, gas, smoke, or any other hazardous environmental condition, including air-purifying respirators, full or half masks, or self-contained breathing apparatuses[,]" or "[a] helmet used to protect the wearer's head during transportation." § 105-140(3)(b-1)-(b-3).

The Ordinance contains limited exceptions. Section 105-140(6)(a) provides that "face coverings may be worn to provide protection against cold or other extreme weather during assignments requiring a law enforcement officer to be outdoors for long periods of time." The Ordinance also excepts "[a] law enforcement officer engaged in an undercover operation" or "[a] special weapons and tactics team officer wearing protective gear while performing his or her special weapons and tactics [Special Weapons and Tactics (SWAT)] team responsibilities." § 105-140(6)(b), (b-1)-(b-2).

The Ordinance also provides that "[w]hen acting in an official capacity, all law

---

[4] In relevant part, "[l]aw enforcement officer" means "any person employed by the state or any political subdivision of the state, for the purpose of detecting and preventing crime and enforcing laws or ordinances and who is authorized to make arrests for violations of the laws or ordinances that the person is employed and sworn to enforce." Wis. Stat. § 165.85(2)(c).

6

enforcement officers shall do one or more of the following:

    a. Display on their uniforms the name or widely recognized initials of the officer's agency and the officer's last name, badge number, or identification number.
    b. Upon request, verbally provide their agency affiliation and last name, badge number, or identification number."

§ 105-140(5), (a)-(b).

This identification requirement also contains the limited exception for "undercover operation[s]" and SWAT actions. § 105-140(6)(b), (b-1)-(b-2).

The Ordinance penalizes "[a]ny person who willfully or knowingly violates" Section 105-140 by providing that they "shall, upon conviction thereof, be subject to a forfeiture of not less than $5,000, nor more than $10,000." § 105-140(7).

Before commencing this lawsuit, the Department of Justice, by a letter dated July 10, 2026, advised Mayor Johnson and City Attorney Goyke that "federal officers will not comply with Milwaukee's unconstitutional ordinances and will continue to wear masks and not use individual identifiers in their discretion." DOJ Letter, ECF 1-3. The letter sought "assurances that neither [their] offices, the Milwaukee Police Department, nor any other entity in Milwaukee plans to enforce [Section 105-140] against federal law enforcement officers." *Id.* In response dated July 17, 2026, City Attorney Goyke reaffirmed the City's intent to enforce the Ordinance, explaining that he "will not advise [his] clients to exempt federal law enforcement officers from enforcement of the Ordinance against them, and that [his] office will prosecute any validly issued citation for acts in violation of the Ordinance."[5] City Attorney Response Letter, ECF 1-4. Additionally, the Milwaukee Common Council has reportedly directed the Milwaukee Police Department to investigate and pursue federal officers for violations, including ICE agents in particular.[6]

_____

[5] This has been the only response from the City to date.
[6] David Clarey, *Milwaukee council members request police investigate masked ICE agents* (July 7, 2026), https://www.jsonline.com/story/news/crime/2026/07/07/milwaukee-council-members-

7

**LEGAL STANDARDS**

A preliminary injunction may be granted if the plaintiff establishes (1) "[it] is likely to succeed on the merits," (2) "[it] is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its] favor," and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374 (2008); *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020); *K.C. v. Individual Members of Med. Licensing Bd. of Indiana*, 121 F.4th 604, 613 (7th Cir. 2024). Where, as here, the Federal Government is a party to the suit, the final two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). In general, where the United States has demonstrated a likelihood of success on the merits of a Supremacy Clause claim, the other factors also favor a preliminary injunction. *See*, *e.g.*, *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013).

A prohibitive preliminary injunction is designed to maintain the status quo ante until a final decision on the merits of the litigation can be entered. *See Westinghouse Elec. Corp. v. Free Sewing Mach. Co.*, 256 F.2d 806, 808 (7th Cir. 1958) ("[A] preliminary injunction is a provisional remedy designed to preserve the status quo until the case can be heard upon the merits."). "The status quo is the last uncontested status which preceded the pending controversy." *Id.*

**ARGUMENT**

**III.     The United States Has Pre-Enforcement Standing**

Article III standing requires a plaintiff to demonstrate a concrete injury that is fairly traceable to the conduct of the defendant and judicially redressable. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "When an individual is subject to" threatened enforcement of a law, "an

---

request-police-investigate-masked-ice-agents/90841445007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z11xx55p115550l004450c115550e1190xxv11xx55d--85--b--85--&gca-ft=202&gca-ds=sophi.

actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *Steffel v. Thompson*, 415 U.S. 452, 459 (1974); *see Entertainment Concepts, Inc., III v. Maciejewski*, 631 F.2d 497, 500 (7th Cir. 1980). Rather, that requirement is satisfied where the plaintiff alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Driehaus*, 573 U.S. at 159 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)); *see Indiana Right to Life Victory Fund v. Morales*, 66 F.4th 625, 629 (7th Cir. 2023). Further, "the [traceability] requirement is met" where "a plaintiff is threatened by the enforcement of a statute that specifically targets the plaintiff." *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 71 (2d Cir. 2019) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992)); *see generally Indiana Right to Life Victory Fund v. Morales*, 66 F.4th 625 (7th Cir. 2023).

The United States easily satisfies these requirements. First, the United States asserts "an intention to engage in a course of conduct arguably affected with a constitutional interest," namely, to act through its officers in accordance with its own policies and with federal law with respect to certain conduct, although proscribed by the Ordinance. *See Driehaus*, 573 U.S. at 159 (citation omitted). The United States has sovereign authority to manage federal law enforcement activities and, under the Supremacy Clause, need not cede that authority to Milwaukee by complying with Milwaukee's purported requirements for federal law enforcement officers. Indeed, the very fact that a municipality is attempting to regulate the conduct of the Federal Government inflicts a "sovereign injury" on the United States. *See Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000); *United States v. Ekblad*, 732 F.2d 562, 563 (7th Cir. 1984) ("The United

9

States has standing to seek relief from actual or threatened interference with the performance of its proper governmental functions.").

Even beyond the sovereign injury itself, which is sufficient for standing to seek an injunction, compliance with Section 105-140 would endanger officers and reduce operational effectiveness by, among other things, subjecting them to standards that may conflict with and differ materially from applicable federal standards and policies. To be clear, the United States will not direct its law enforcement agencies to require its officers to comply with these provisions of Milwaukee law. *See* Karr Decl.[7] ¶ 18; Smith Decl.[8] ¶ 20; Kubiszewski Decl.[9] ¶ 16. In consequence, federal officers are threatened with civil penalties. *See* § 105-140(7). That poses a serious and concrete injury that the Federal Government is entitled to address through this pre-enforcement challenge.

Second, the threat of future enforcement is substantial as the Ordinance has already taken effect, and Milwaukee has proclaimed its intent to enforce its provisions against federal officers. For example, in a July 17 letter to the Department of Justice, City Attorney Evan Goyke rebuked the Federal Government's attempts to ensure Milwaukee would comply with federal law, writing that "my office will prosecute any validly issued citation for acts in violation of the Ordinance," and reaffirming that "we will prosecute properly cited offenders." City Attorney Response Letter, ECF 1-4. Further, Milwaukee Common Council has reportedly directed the Milwaukee Police Department to investigate and pursue federal officers for violations, including ICE agents.[10]

---

[7] "Karr Decl." refers to the July 23, 2026 declaration of Alan Karr of FBI, filed with this motion.
[8] "Smith Decl." refers to the July 24, 2026 declaration of Todd C. Smith of DEA, filed with this motion.
[9] "Kubiszewski Decl." refers to the July 24, 2026 declaration of Cassandra Kubiszewski of ICE, filed with this motion.
[10] David Clarey, *Milwaukee council members request police investigate masked ICE agents* (July 7, 2026), https://www.jsonline.com/story/news/crime/2026/07/07/milwaukee-council-members-request-police-investigate-masked-ice-agents/90841445007/?gnt-cfr=1&gca-cat=p&gca-

Milwaukee's Ordinance further threatens immediate harm to the United States as the challenged provisions would deter officers from taking safety measures necessary to protect their health, well-being, identities, and families, which can also chill federal law enforcement operations. *See* Karr Decl. ¶ 16; Smith Decl. ¶¶ 17-20; Kubiszewski Decl. ¶¶ 15, 34; Hargis Decl.[11] ¶¶ 16-17. These laws thus threaten the strong federal interest in "serv[ing] the public good by zealous enforcement of the law and the avoidance of deterring talented candidates from entering government employment for fear of liability." *Jensen v. Lane Cnty.*, 222 F.3d 570, 576 (9th Cir. 2000).

In short, Section 105-140 imposes concrete and immediate harms on the Federal Government and its interests by threatening federal officers with prosecution and, in turn, chilling their protected conduct and endangering both their safety and the integrity of federal operations. *See, e.g.*, Karr Decl. ¶¶ 13-16; Smith Decl. ¶¶ 17-20; Hargis Decl. ¶¶ 16-17; Kubiszewski Decl. ¶¶ 27-35. The United States thus has standing to challenge these laws and need not wait for the potentially dangerous situation that would occur were the City of Milwaukee to attempt to enforce the Ordinance against a federal officer in the performance of his or her official duties.

## IV. The United States is Likely to Succeed on the Merits of its Claims

The Ordinance is invalid as it purports to regulate federal law enforcement officers by explicitly defining "law enforcement officer" to include "any employee or agent of the United States government who has authority to carry firearms and make warrantless arrests and whose duties involve the enforcement of criminal, customs, or immigration laws of the United States." § 105-140(3). The Ordinance also applies its facial coverings prohibition and identification

---

uir=true&gca-epti=z11xx55p115550l004450c115550e1190xxv11xx55d--85--b--85--&gca-ft=202&gca-ds=sophi.

[11] "Hargis Decl." refers to the July 24, 2026 of Justin Hargis of CBP, filed with this motion.

requirements (including penalties for violations) to federal officers. *See* §§ 105-140(4), 105-140(5), 105-140(5)(a)-(b), 105-140(7). All such regulation of federal officers violates the Supremacy Clause. The United States therefore is likely to succeed on the merits.

### A.    Applicable Law

Under the Supremacy Clause, States have "no power" to "in any manner control[] the operations of" the Federal Government. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819); *see Mayo v. United States*, 319 U.S. 441, 445 (1943) ("[T]he activities of the Federal Government are free from regulation by any state."). The intergovernmental immunity doctrine encapsulates this principle. *United States v. Washington*, 596 U.S. 832, 838 (2022) (The Supremacy Clause "prohibit[s] state laws that *either* 'regulat[e] the United States directly *or* discriminat[e] against the Federal Government . . . .'"). A state or local law violates intergovernmental immunity if it "regulates the United States directly," *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion), "unless Congress provides 'clear and unambiguous' authorization for such regulation," *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 175 (1988) (citation omitted).

Furthermore, "intergovernmental immunity . . . forbids States from regulating the federal government *qua* government and from controlling federal governmental functions in any manner and to any degree." *United States v. California*, 173 F.4th 1060, 1068 (9th Cir. 2026); *see CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 321 (3d Cir. 2025) (A state law unlawfully regulates the United States when it "'places [either] a prohibition' or mandate on the federal government.") (quoting *Hancock v. Train*, 426 U.S. 167, 180 (1976))). "A direct regulation is one that 'lays hold of' federal officers 'in their specific attempt to obey orders and requires qualifications in addition to those that the [Federal] Government has pronounced sufficient.'"

*United States v. California*, 173 F.4th at 1067 (quoting *Johnson v. Maryland*, 254 U.S. 51, 57 (1920)).

For instance, in *Johnson*, the Supreme Court held that a state could not require a Post Office employee to obtain a driver's license from the state, explaining that the state may not "require[] qualifications in addition to those that the [Federal] Government has pronounced sufficient." 254 U.S. at 57. In *Hancock*, the Supreme Court concluded that a state could not forbid federal facilities from operating without a state pollution permit, as such a requirement improperly "place[d] a prohibition on the Federal Government." 426 U.S. at 179-80 (quotation marks omitted).

**B.    The Challenged Ordinance Impermissibly Regulates the Federal Government**

Despite this clear and longstanding precedent, the City of Milwaukee seeks to impose municipal mandates directly on federal law enforcement officers carrying out their official duties within the City. The City's Ordinance thus purports to regulate federal law enforcement officers directly and accordingly is unconstitutional.

Specifically, the Ordinance purports to require that no federal law enforcement officer "may wear a face covering while interacting with the public in the performance of the officer's duties," except during extreme weather and certain limited types of operations. §§ 105-140(4); 105-140(6)(a)-(b-2). It also purports to require federal law enforcement officers, "[w]hen acting in an official capacity," to "[d]isplay on their uniforms the name or widely recognized initials of the officer's agency and the officer's last name, badge number, or identification number" or alternatively "verbally provide their agency affiliation and last name, badge number, or identification number" upon request, with limited exceptions. §§ 105-140(5), (a)-(b), 105-140(6)(b)-(b-2). And the Ordinance subjects federal officers to civil liability between $5,000 and $10,000 for non-compliance. § 105-140(7). The Ordinance therefore purports to directly regulate

13

federal law enforcement officers in the course of their federal duties by mandating them to comply with municipal uniform and identification requirements and penalizing those officers even when they are complying with federal laws.

Courts have uniformly enjoined materially similar state and local laws as unconstitutional direct regulation of the Federal Government. *See, e.g.*, *United States v. California*, 173 F.4th at 1069; *United States v. City of Philadelphia*, No. 2:26-cv-4208, 2026 WL 1906075, at *11 (E.D. Pa. July 2, 2026) ("Simply put, through Bill 260060, Defendants seek to directly regulate federal agents and law enforcement officers in the performance of their federal functions. Allowing the City of Philadelphia to do that would change totally the character of our federal system by transferring the supremacy, in fact, to a municipality." (cleaned up)); *United States v. Commonwealth of Virginia*, No. 3:26-cv-545, 2026 WL 1909995, at *10 (E.D. Va. July 2, 2026) ("The Mask/Identity Law requires that federal law enforcement officers satisfy additional requirements placed on them by Virginia – identification requirements, and masking requirements – which are not required under federal law, and which the federal authorities specifically say they need not meet. That offends the principle of intergovernmental immunity that forecloses application of the State law here.").

As the Ninth Circuit observed with regard to a similar California law that sought to require federal law enforcement officers to "visibly display identification" when "performing their enforcement duties," the challenged identification requirement "purports to override the federal government's power to determine whether, how, and when to publicly identify its officers[,]" "[a]nd in so doing, it aims to regulate the manner and conditions under which federal agents can enforce federal law." *United States v. California*, 173 F.4th at 1067. That reasoning applies directly to the Milwaukee identification requirements in the Ordinance and applies with equal force to the

14

facial covering ban. Each provision seeks to regulate the manner and conditions under which federal officers must operate when conducting their official duties and enforcing federal law. *See id.* Neither states nor localities have the power to do that.

Federal law enforcement agencies enforce federal law throughout the United States and in doing so are generally not required to comply with individual state and local laws when operating within the scope of their official duties. *See, e.g.*, *Johnson*, 254 U.S. 51; *Arizona v. California*, 283 U.S. 423, 451 (1931) ("The United States may perform its functions without conforming to the police regulations of a state."); *Davis*, 100 U.S. at 262-63 ("If, when . . . acting . . . within the scope of their authority, [federal] officers can be arrested and brought to trial in a State court, for an alleged offence against the law of the State . . . the operations of the general government may at any time be arrested at the will of one of its members."); *In re Neagle*, 135 U.S. 1, 75 (1890) ("[I]f the prisoner is held in the state court to answer for an act which he was authorized to do by the law of the United States, which it was his duty to do as marshal of the United States, and if, in doing that act, he did no more than what was necessary and proper for him to do, he cannot be guilty of a crime under . . . [state] law.").

Moreover, a state or local law that directly regulates the conduct of the Federal Government or discriminates against it is invalid, *see Washington*, 596 U.S. at 835, and "Supreme Court case law compels the rejection of a *de minimis* exception to the doctrine of intergovernmental immunity." *United States v. California*, 921 F.3d 865, 883 (9th Cir. 2019). It is an unconstitutional and burdensome regulation on the Federal Government to have its officers face potential liability from state and local officials, who have no authority to prosecute or penalize federal officers for actions taken in the performance of their duties. *See United States v. California*, 173 F.4th at 1067-68 (holding state law invalid because it "purports to override the federal government's power to

determine whether, how, and when to publicly identify its officers" and thus "directly regulates inherently governmental conduct of federal officers carrying out their duties *under federal authority*")).

Section 105-140 thus violates the Supremacy Clause. By dictating when federal officers may wear facial coverings and what identification they must display or provide while carrying out their official duties—whether on their person or upon request—the Ordinance improperly seeks to regulate how the Federal Government carries out its criminal and civil law enforcement functions in the City. *See* § 105-140(2) ("This section is enacted . . . to . . . ensure transparency and accountability in law enforcement operations within [the City's] jurisdiction."). Accordingly, the challenged provisions are facially invalid and unconstitutional as they pertain to federal law enforcement officers, and their enforcement against such officers should be enjoined.

Defendants may argue that to prevail, the United States must show that enforcement of the Ordinance would hinder Federal Government operations. Not so. Of course, hindering core Federal Government operations is one way to show that a state or locality has engaged in impermissible direct regulation of the Federal Government, and Milwaukee's Ordinance does so, as explained further below. *See Pub. Utils. Comm'n of State of Cal. v. United States*, 355 U.S. 534, 543 (1958) (holding that a state law that barred federal officials from hiring shipping contractors without state approval violated intergovernmental immunity where the law would have delayed shipments, thereby hampering military missions); *California*, 921 F.3d at 880 (explaining that intergovernmental immunity is implicated when a state "burden[s] [the Federal Government] in some way"). But such a hindrance is not necessary to establish a Supremacy Clause violation. *See United States v. California*, 173 F.4th at 1067 ("[I]f a state law directly regulates the conduct of the United States, it is void irrespective of whether the regulated activities are essential to federal

16

functions or operations, and irrespective of the degree to which the state law interferes with federal functions or operations.").

And despite the Ordinance's clause that "[n]othing in this section shall be interpreted to prohibit, restrict, or interfere with the proper exercise of state or federal law enforcement[,]" the challenged provisions indeed "prohibit, restrict, [and] interfere" with how federal law enforcement officers perform their governmental duties and conduct operations. § 105-140(2)(b); *see Washington*, 596 U.S. at 838; *see also supra* at 11.

Moreover, Section 105-140's exceptions confirm rather than cure its constitutional defects. §§ 105-140(6)(a)-(b-2). Defendants may point to the Ordinance's exception for undercover operations as evidence that the law leaves federal law enforcement unimpeded. It does not. The exception is narrow, ill-defined, and does nothing to address the many circumstances in which the Federal Government has independently determined that non-disclosure or delayed disclosure of an officer's identity are operationally necessary—for example, in surveillance and plainclothes operations, as well as other sensitive law enforcement activities that do not fit neatly within the Ordinance's undefined categories. The exception offers no real refuge: it substitutes the City's own judgment about when federal facial covering and officer identity disclosure practices are necessary for the Federal Government's, which is precisely the kind of local override of federal operational judgment the Supremacy Clause forecloses. A municipality cannot cure an unconstitutional regulation of federal law enforcement by carving out limited exceptions it deems acceptable; the decisions when facial coverings and delayed or non-disclosure of officer identity are operationally necessary belong to the Federal Government alone, not Milwaukee. *See McCulloch*, 17 U.S. at 362 ("But, surely, the framers of the constitution did not intend, that the exercise of all the powers of the national government should depend upon the discretion of the state governments."); *Mayo*,

17

319 U.S. at 445 ("[I]t is necessary for uniformity that the laws of the United States be dominant over those of any state. Such dominancy is required also to avoid a breakdown of administration through possible conflicts arising from inconsistent requirements.").

For these reasons, the United States is likely to succeed on the merits. *See Washington v. Indiana High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 846 (7th Cir. 1999) ("In the preliminary injunction context, a 'likelihood of success' exists if the party seeking the injunctive relief shows that it has a 'better than negligible' chance of succeeding on the merits.") (citation omitted)).

## V.      The United States Faces Irreparable Harm Absent Preliminary Relief

The United States will suffer irreparable harm if the Ordinance is enforced against the Federal Government. Irreparable harm necessarily results from the enforcement of a state or local law that violates the Supremacy Clause. *See New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 366-67 (1989) (noting that irreparable injury may be established "by a showing that the challenged state statute is flagrantly and patently violative of . . . the express constitutional prescription of the Supremacy Clause" (citation omitted)); *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011) (finding irreparable harm based on a Supremacy Clause violation), *aff'd in part, rev'd in part and remanded*, 567 U.S. 387 (2012).

The automatic nature of the irreparable injury stems both from the constitutional violation and the sovereign injuries that result. *United States v. California*, 173 F.4th at 1069. And granting the preliminary injunction would not result in a greater harm to Milwaukee because "there can be no irreparable harm to a [government] when it is prevented from enforcing an unconstitutional statute . . . ." *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004). Thus, the United States satisfies this element of the preliminary injunction standard. *See United States v. Connecticut*, 566 F. Supp. 571, 579 (D. Conn. 1983) (concluding "without hesitation that the

18

United States has shown that it will be irreparably injured by the continuing violation of . . . a Federal statute, that would result from failure to enjoin enforcement of the Connecticut statute"), *aff'd without opinion*, 742 F.2d 1443 (2d Cir. 1983), *aff'd without opinion*, 465 U.S. 1014 (1984).

Additionally, the Ordinance poses several other irreparable harms, including endangering federal law enforcement officers, impeding their functions, and chilling federal activities. For instance, these provisions, by design, endanger federal officers because they seek to publicly expose their personal identities at a time of already escalating instances of violence or threats of violence against federal officers. *See, e.g.*, Hargis Decl. ¶¶ 6, 9-11. This exposure would facilitate escalating instances of harassment against those officers by agitators seeking to disrupt enforcement operations. *See* Karr Decl. ¶¶ 14-15; Smith Decl. ¶¶ 15-16; Hargis Decl. ¶¶ 16-17. For example, ICE officers are facing a drastic increase in death threats and assaults, which are facilitated by doxxing websites that broadcast the identities and home addresses of officers and their families, encouraging retaliation against them. *See, e.g.*, Kubiszewski Decl. ¶¶ 19-26 (describing threats against ICE officers). CBP has also seen a significant rise in assaults against officers and agents since January 2025. Hargis Decl. ¶ 6.

The Ordinance also impedes federal functions because it fails to sufficiently account for instances in which federal officers might interact with the public when performing their official duties. Disclosure of officers' identities could place them or others at risk, including, for example, surveillance or plainclothes assignments, which would jeopardize such operations. *See* Smith Decl. ¶¶ 14, 17; Hargis Decl. ¶¶ 17-18. Under the Ordinance, agents in such situations face a risk of prosecution for merely doing their jobs in an inconspicuous manner as is called for by such scenarios. Further, the challenged provisions would enable suspects to identify officers who might be involved in future enforcement actions, including undercover operations. *See, e.g.*, Karr Decl.

¶ 16; Smith Decl. ¶ 18; Hargis Decl. ¶ 17. Because suspects who recognize officers may try to evade apprehension and obstruct enforcement efforts, the discretion to modify uniforms to protect officers' identities is critical for maintaining operational effectiveness, especially in areas where repeat offenders or organized criminal networks are prevalent. *See, e.g.*, Karr Decl. ¶¶ 16, 17; Smith Decl. ¶¶ 17-19.

Federal agents around the country have recently been targeted for harm, including harassment, assault, and murder. These targeted threats have expanded to include extended family members. For example, an FBI agent earlier this year was forced to abandon his FBI vehicle when a crowd of protestors rushed a group of federal law enforcement agents. Karr Decl. ¶ 15. The crowd subsequently vandalized the vehicle and stole the agent's personal items, including his FBI credentials and driver's license. *Id.* His name and local address were subsequently posted online. *Id.* The threats to the agent and his extended family, via social media and U.S. mail, have continued to this day, necessitating the need for FBI protection measures. *Id.*

Further, due to the nature of law enforcement operations, federal officers require flexibility to determine when to announce their identities. For example, CBP and ICE have discretion on when they permit their officers and agents to wear facial coverings, whether to add or remove individual identifiers, and what identification is provided to individuals upon request.[12] That is up to the agencies and officers based on the facts and circumstances in a particular case and cannot be subjected to bright-line or conflicting local rules or subject to civil liability. Removing this flexibility and requiring federal officers to identify themselves to any member of the public upon

---

[12] For instance, federal regulations provide that "an immigration officer who is authorized to execute an arrest" announce himself and the purpose of the arrest "as soon as it is practical and safe to do so." 8 C.F.R. § 287.8(c)(2)(iii).

request would undermine officer safety and operational effectiveness, particularly when the consequence of noncompliance involves hefty penalties.

Accordingly, once officer safety or the integrity of an operation is compromised, the harm cannot be undone. And while there are limited exceptions to the challenged provisions of the Ordinance, they would not encompass operations that would require agency or officer discretion on facial coverings and identification contrary to the City's Ordinance, and it is unclear who determines whether those requirements are even met. §§ 105-140(6), 105-140(b-1)-(b-2).

Compliance with the challenged provisions would prevent federal law enforcement officers from effectively engaging in important federal enforcement operations. *See* Karr Decl. ¶¶ 16-18; Smith Decl. ¶¶ 12, 20. And because the Ordinance carries hefty penalties up to $10,000 per violation, the threat of such liability can chill officers from engaging in lawful conduct in the performance of their federal duties in Milwaukee, which will endanger officers and limit their federal functions. Thus, officers may self-censor, alter their conduct, or assume unreasonable risks to themselves to avoid exposure to enforcement of the Ordinance, and that risk to officer safety or operational disruption creates immediate and concrete harm that cannot be remedied after the fact.

For these reasons, the challenged provisions threaten to "destroy the federal function" of law enforcement in Milwaukee. *United States v. Fresno Cnty.*, 429 U.S. 452, 463 n.11, 464 (1977). Because the Framers of our Constitution "did not intend" for federal operations to "depend on the discretion of the state governments," *McCulloch*, 17 U.S. (4 Wheat.) at 327, 362, the City of Milwaukee cannot unilaterally impose its policy preferences on the Federal Government. A "concurrent power in the [S]tates" to regulate federal operations "would bring back all the evils and embarrassments, which the uniform rule of the [C]onstitution was designed to remedy." 2 J. STORY, COMMENTARIES ON THE CONSTITUTION § 1099 (3d ed. 1858).

Finally, allowing a municipality to penalize federal officer conduct sets a precedent that would fragment federal operations across jurisdictions nationwide. Indeed, if the Ordinance were allowed to stand, there would be nothing to stop other municipalities and states from imposing further unconstitutional restraints on the Federal Government. *See Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 373 (2008) (allowing a state to act unconstitutionally "would allow other States to do the same"). This could in turn create a "patchwork" system of laws, *id.*, under which federal agents would be subject to different regulations in each municipality and state, severely undermining the Federal Government's ability to uniformly enforce federal law.

Take, for example, a violent gang investigation where masked federal agents conduct surveillance to observe a drug transaction in a high crime area within the City limits, taking precautions to avoid compromising their safety or the ongoing investigation without wearing identification. Not only would Milwaukee impose liability for those precautionary aspects of the operation, but if a suspect approached the agents and requested production of their badges, Milwaukee would impose civil liability for the agents' failure to do that as well. Each federal agent involved apparently would be exposed to upwards of $20,000 in "forfeiture" for wearing a facial covering and failing to display or provide identification. *See* §§ 105-140(4), 105-140(5)(a)-(b), 105-140(7). Moreover, Milwaukee would apparently impose those penalties anew for each instance the unidentified agents took the same precautions during the operation. *See id.* This demonstrates the radical and dangerous implications of Milwaukee's Ordinance.

Milwaukee is not alone in attempting to subject federal law enforcement officers to regulation of this kind. As the court in *United States v. City of Philadelphia* correctly observed:

> "If the Court were to accept Defendants' argument that the City of Philadelphia has the authority to directly control how federal officers carry out their law enforcement operations, consider, for a moment, what other municipalities across the United States might do. Indeed, there are more than one thousand municipalities in the

State of Pennsylvania alone, and thousands more nationwide. Endorsing the City of Philadelphia's position would mean that each of those municipalities could decide whether to pass their own laws regulating how, when, where, and whether federal law enforcement officers can conceal their identities, which, in turn, would quickly devolve into a 'patchwork' of local and 'state laws [that] "would defeat all the ends of government"' and cause serious national disruption."

2026 WL 1906075, at *11 (citations omitted). The same analysis applies to the City of Milwaukee and the State of Wisconsin at large, and that growing patchwork of unconstitutional regulations only further demonstrates that the United States faces irreparable harm from Section 105-140. Indeed, each of the three courts that have addressed similar state and local measures has found irreparable harm. *See id.* at *13; *United States v. California*, 173 F.4th at 1069; *United States v. Commonwealth of Virginia*, 2026 WL 1909995, at *14.

## VI.     The Balance of Hardships and the Public Interest Weigh in the United States' Favor

The merged factors of the balance of equities and the public interest likewise favor the United States. *See Nken*, 556 U.S. at 435. Once the moving party establishes a likelihood that the government action was unconstitutional, "the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 589–90 (7th Cir. 2012) (citation omitted).

As an initial matter, there is no public interest in a state or locality violating the Supremacy Clause by directly regulating federal law enforcement. There is, however, significant public interest in protecting federal officers' safety and removing unlawful impediments to federal law enforcement operations. Indeed, "[f]rustration of federal statutes and prerogatives are not in the public interest[.]" *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012); *see Am. Fin. Servs. Assn. v. Burke*, 169 F. Supp. 2d 62, 71 (D. Conn. 2001) (finding that "while the efforts of the Connecticut legislature to curb 'predatory lending' practices . . . may be admirable and

23

important, until Congress limits the enforceability of arbitration clauses in certain contexts, the Court must follow the [Federal Aviation Administration]'s broad mandate providing for the enforcement of such clauses").

Further, it is not in the public interest to require federal officers to comply with varying state and local standards for facial coverings and identification when federal policy is designed to comply with federal law. Likewise, it is not in the public interest to subject federal officers to increased harassment, doxxing, and violence, which can impact not only their official duties but also their personal lives and families. Thus, the balance of equities weighs in favor of the United States. The aim of Milwaukee's Ordinance is to hinder federal officers from participating in crucial law enforcement operations in the City and to chill effective enforcement of federal law. *See supra* at 5. Such obstructionism is not in the public interest. Rather, the public has a strong interest in preserving constitutional order and effective federal law enforcement, including drug enforcement, as well as immigration and counterterrorism operations conducted in Milwaukee. And the City's residents benefit from federal law enforcement presence and operations that would otherwise be chilled or curtailed by enforcement of the Ordinance.

Moreover, preliminarily enjoining the Ordinance will not cause greater harm to Defendants. Federal officers face penalties and operational disruption under the Ordinance, while an injunction would merely restore the status quo that existed before the City enacted Section 105-140. *See Westinghouse Elec. Corp.*, 256 F.2d at 808 ("The status quo is the last uncontested status which preceded the pending controversy."). Since Milwaukee can pursue its accountability objectives through means that do not unconstitutionally regulate federal officers, the hardship of enjoining this specific mechanism is minimal. And while Milwaukee may disagree with the United States' priorities, it has no legitimate interest in interfering with the enforcement of federal law or

putting federal officers at risk. Thus, not only does the balance of equities support a preliminary injunction, but the public interest would be served by the issuance of such an injunction. *See Mayo*, 319 U.S. at 445 ("No other adjustment of competing enactments or legal principles is possible."). Each of the three courts that have addressed similar state and local measures has agreed the balance tips in the Federal Government's favor. *See United States v. California*, 173 F.4th at 1069; *United States v. City of Philadelphia*, 2026 WL 1906075, at \*14; *United States v. Commonwealth of Virginia*, 2026 WL 1909995, at \*14. This Court should as well.

**<u>CONCLUSION</u>**

For the foregoing reasons, the United States respectfully requests that this Court preliminarily enjoin the Defendants, as well as their officers, agents, servants, employees and attorneys, and all those working in concert or participation with them, from enforcing Milwaukee Code of Ordinances § 105-140 as to federal law enforcement officers.

DATED: July 24, 2026

25

Respectfully submitted,

STANLEY E. WOODWARD, JR.
Associate Attorney General

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

BRAD D. SCHIMEL
First Assistant United States Attorney
Eastern District of Wisconsin

ANNA EDWARDS
Counsel to the Associate Attorney General

CHARLES E.T. ROBERTS
Senior Counsel to the Assistant Attorney General
Civil Division

JACQUELINE COLEMAN SNEAD
Deputy Director

*/s/ Pooja D. Majmundar*
POOJA D. MAJMUNDAR
DC Bar No. 1779930
Trial Attorney
U.S. Department of Justice, Civil Division
Enforcement & Affirmative Litigation Branch
P.O. Box 386
Washington, D.C. 20044-0386
(202) 598-0280
Pooja.D.Majmundar@usdoj.gov

*Attorneys for the United States of America*

26

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2026, I electronically filed this motion and supporting brief with the Clerk of the Court using the CM/ECF system. Because Defendants have not yet appeared in this matter, I will send a copy of the foregoing motion and supporting brief to Defendants either by email or by service of process.

*/s/ Pooja Majmundar*
Pooja Majmundar
Trial Attorney
U.S. Department of Justice, Civil Division
Enforcement & Affirmative Litigation Branch
P.O. Box 386
Washington, DC 20044-0386
Telephone: (202) 598-0280
Email: Pooja.D.Majmundar@usdoj.gov